**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

------------------------------------------------------------------X
VARDA BURSTEIN and similarly situated Digital
Security Holders,

                                Plaintiffs,

           -against-                                     Civil Action No. 1:21-cv-793


AUTOLOTTO, INC., and TONY DIMATTEO,               **COMPLAINT**

                               Defendants.
------------------------------------------------------------------X


Plaintiff, Varda Burstein, hereafter "Plaintiff" by way of Complaint against Defendants, AutoLotto, Inc. and Tony DiMatteo, hereafter "AutoLotto" and "DiMatteo" alleges:

**PRELIMINARY STATEMENT**

1.      Plaintiff, Varda Burstein, is a reluctant litigant.

2.      She is forced to bring this lawsuit because it is the only mechanism available to ensure that an outrageous and blatant fraud is not allowed to continue, to get relief for the three (3) million dollars in damages she has already sustained, and to obtain justice for the unlawful acts Defendant perpetrated against her and likely many other similarly situated investors.

3.      In 2018, Varda invested $3 million with AutoLotto, an online lottery company that generated revenue through state-sanctioned lotteries and charitable raffles.

4.      In February 2021, AutoLotto was in the process of being acquired by Trident Acquisitions Corp. ("Trident") for hundreds of millions of dollars. Indeed, in July 2021, it was announced that AutoLotto would be receiving $43 million in cash to expand its operations.

5.      Varda's investment took the form of a convertible note, which would convert into equity in AutoLotto if a qualified financing did not occur within two years of her investment.

1

6.     With the two-year mark quickly approaching and a qualified financing likely not on the horizon, AutoLotto, and many individuals who stood to benefit tremendously from a sale of AutoLotto, realized that Plaintiff (and many other convertible note holders) would soon share in the profits resulting from the future acquisition of AutoLotto.

7.  AutoLotto, doubtless with the assistance of clever attorneys its principals (including CEO, Tony DiMatteo), and consultants, announced that investors could convert their investment. This conversion was couched as a "digital security," giving the holder access to a portion of revenue in an online lottery platform that AutoLotto would claim had amazing potential and promise.

8.     Unbeknownst to the AutoLotto investors like Varda, AutoLotto was using this vehicle to remove future equity holders and push them into a subsidiary company that was doomed.

9.     Indeed, virtually no efforts were made to ensure the platform would be viable, later claiming that this was the built-in risk inherent to "digital securities."

10.    Also, unbeknownst to the investors was that, even though virtually all communications were originating with AutoLotto, the online lottery platform they were being shunted off to was separate and distinct from AutoLotto. More importantly, any successes and revenues AutoLotto, the company in which Varda and the others had invested, were also being shunted.

11.    With this deceitful maneuver, AutoLotto would keep all of its investors' money, wipe them out from the capitalization tables, and divert from these investors all of the benefits of their investments without ever having to account to them.

12.    AutoLotto's scheme is all but confirmed given that, since her receipt of these "digital securities" on July 25, 2018, she has only received a single revenue distribution of $802.15 on her $3-million investment, or 0.000267% of her original investment, while it is reported

2

AutoLotto's revenue has grown tremendously and the company is on the precipice of being purchased.

13.     Moreover, AutoLotto has since confirmed that (a) the new platform is currently out of use and (b) AutoLotto has no plans to utilize the platform in the future.

14.     Unfortunately for AutoLotto, Plaintiff will not sit idly by as AutoLotto attempts to victimize her and steal her money through blatant fraudulent transactions. If the other investors will not take up this cause, Plaintiff will.

15.     Simply put, Plaintiff will not be a victim.

16.     As such, Plaintiff's only opportunity to seek redress for AutoLotto's fraudulent scheme that it perpetrated on her (and other unknowing investors) resides in this court.

## PARTIES

17.     The Plaintiff in this matter is Varda Burstein, a resident of the country of Israel.

18.     The Defendant in this matter is AutoLotto, with a principal place of business located at 13301 Galleria Circle Street, Suite 200, Austin, Texas 78738.

19.     Defendant in this matter, Tony DiMatteo, upon information and belief, resides in the State of Texas and/or conducts business in the State of Texas to satisfy jurisdictional thresholds.

## JURISDICTIONAL STATEMENT

20.     Federal jurisdiction is appropriate in this case pursuant to 28 U.S.C.A 1332(a)(2).

21.     Federal jurisdiction is also appropriate in this case pursuant to 28 U.S.C.A 1331.

**FACTUAL BACKGROUND**

22.     AutoLotto is an online lottery company that enables consumers to play state-sanctioned lottery games. It is currently operating in forty U.S. States and is active in over 130 countries.

23.     Burstein is a self-employed businesswoman residing in Israel.

24.     Tony DiMatteo is the CEO of AutoLotto.

**THE AUTOLOTTO INVESTMENT**

25.     In early 2018, Burstein attended a financial seminar.

26.     At the financial seminar, the world-renowned investor and entrepreneur, Peter Diamandis, presented on stage about AutoLotto.

27.     Burstein was intrigued by AutoLotto, as she believed online lotteries had massive potential and she was impressed with AutoLotto's early domination of the market space.

28.     After Plaintiff connected with Peter Diamandis at the financial seminar, Diamandis set up a three-way call among himself, Burstein, and the founder and CEO of AutoLotto, Tony DiMatteo.

29.     That phone call went well and Burstein was convinced of AutoLotto's viability and its financial prospects. She decided to invest in AutoLotto. She subsequently invested $3 million into AutoLotto.[1]

30.     Plaintiff's investment took the form of a convertible note. *See* Exhibit A ("the AutoLotto Investment").

---

[1] During this phone call, neither Peter Diamandis nor Tony DiMatteo discussed AutoLotto's subsidiary LDC Crypto Universal PLC ("LDC").

31.     Pursuant to the terms of the AutoLotto Investment, the $3-million investment, plus interest, would be repaid upon the occurrence of a qualified financing, *i.e*, an initial coin offering of Lottery.com. *See* Exhibit A at par. 2(b).

32.     If a qualified financing did not occur within two years of execution of the convertible note, Plaintiff's investment would convert into equity securities in Lottery.com. *See* Exhibit A at par. 2(a).

33.     Plaintiff saw this as a win-win: either (a) her investment would be repaid with interest if a qualified financing occurred or (b) she would become an equity owner of AutoLotto, a company she believed in.

## THE AUTOLOTTO CONVERSION SCHEME PERPETRATED ON PLAINTIFF

34.     After her investment in AutoLotto, there was virtually no contact between the two Parties.

35.     However, with the two-year mark approaching and having not been informed of any qualified financing on the horizon, AutoLotto understood that Plaintiff (and many other convertible note holders) would soon become shareholders in AutoLotto.

36.     The company decided that it could not permit this to happen.

37.     It was around this time that AutoLotto began putting its scheme into motion. AutoLotto, through the commands of its CEO, would dupe investors into converting their notes into new and exciting "digital securities" that would entitle the "digital security" holder to a portion of revenue in the platform that AutoLotto would claim had amazing potential and promise.

38.     Then after the investors converted their note, AutoLotto put essentially no effort into making the platform profitable and later claimed that this was a risk of investing in risky "digital securities."

39.     AutoLotto first reached out to Burstein in June 2018, to explore the "amazing opportunity" to convert her note into "digital securities."

40.     AutoLotto made it appear that these "digital securities" were a huge opportunity, in part, through the sheer size of the offering.

41.     Specifically, AutoLotto stated that this round of investment was seeking close to $500 million in investments:

**Total Digital Securities and Distribution**

The Company has authorized a total of 550,000,000 Digital Securities to be available for issuance by the Company. As of the date of this Memorandum, the Company has committed to issue, or expects to issue, the following Digital Securities:

**LDC Crypto Universal PLC – Digital Securities Allocation**

| Holder | Amount | Price | Issuer Control[1] |
|---|---|---|---|
| Cash investors in this Offering | 235,000,000 | US$2.00 | No |
| Note Conversions in this Offering | 50,000,000 | US$1.00 | No |
| Issuer Control Allocation on Note Conversions | 50,000000 | US$0.00 | Yes |
| Strategic Investor | 69,863,370 | $0.007 | Yes |
| Strategic Advisors | 20,769,148 | $0.03 | Yes |
| Committed for Acquisitions | 7,000,000 | US$0.05 | Yes |
| Employee and Founder Grants | 28,500,000 | US$0.05 | Yes |
| Placement Agent | 2,850,000 | US$0.00 | No |
| Total | 462,982,518 | | |

[1]     Holders of Issuer Control securities will receive securities that are Non-Participating and Non-Transferrable securities until they meet the applicable vesting criteria. *See* "Issuer Control Restrictions" below.

The Company is offering up to 235,000,000 Digital Securities in this Offering for cash at a price of US$2.00 per Digital Security.

*See* Exhibit C at p. 25 (235,000,000 for $2.00 is $470,000,000).

42.     Further, AutoLotto told the holders of the convertible notes that "substantially all of the promissory notes are expected to convert." *See id.*

43.     Additionally, AutoLotto was offering the "digital securities," known as "tokens,"
at a 50% discount. *See id.*

44.     AutoLotto intentionally used manipulative tactics to influence Burstein into
believing this opportunity with AutoLotto was too good to pass up.

45.     Furthermore, Plaintiff was led to believe that the money she previously invested
was already used, at least in part, to fund this new platform and was intimately linked with it:

> In addition, Lottery.com previously issued and has outstanding promissory notes with approximately US$50 million in aggregate principal and accrued interest. The proceeds of the promissory notes have been used, in part, to fund the cost of the current development of the LDC Platform. The promissory notes were issued in contemplation of this Offering and will mature once the Company has raised US$20 million from the sale of Digital Securities. Under the terms of the promissory notes, rather than receiving repayment in cash, the holders have the option to convert the outstanding principal and interest into Digital Securities at 50% of the offering price being a price of US$1.00 per Digital Security. The holders of substantially all of the promissory notes are expected to elect to convert their promissory notes.

*See id.*

46.     Additionally, this same provision notes that the "promissory notes" would mature
once the Company raised $20 million. *See id.*

47.     Plaintiff executed the documents provided to her by AutoLotto, which included a
Subscription Agreement and Private Placement Memorandum with AutoLotto's subsidiary, LDC,
on or about July 25, 2018. *See* Exhibit C.

48.     She was granted 6,020,652 "digital securities." *See* Exhibit C at p. 12.

49.     Burstein was also led to believe these "digital securities," which AutoLotto referred
to as "tokens," would grant her the right to share in raffle generated from AutoLotto.

50.     Her belief was backed up by several emails sent by AutoLotto offering her to
participate in "Lottery.com['s] Charitable Raffle token sale." *See* Exhibit B ("In the coming steps,

you will be presented with the Promissory Note and Token Grant documents, associated with the 50% discount phase of our token sale.")

51.     And in the same provision cited above, it states specifically that "the promissory notes were issued in contemplation of this Offering and will mature once the Company has raised $20,000,000 from the sale of "digital securities." *See* Exhibit C.

52.     Importantly, pursuant to the terms of the original $3-million convertible note with AutoLotto, one qualified financing was the sale of the $20,000,000 in AutoLotto's equity securities:

> (ii)     the Company's issuance and sale of shares of its equity securities ("*Equity Securities*") to investors (the "*Investors*"), (excluding the conversion and/or issuance of any note, or other convertible securities issued for capital raising purposes (*e.g.*, Simple Agreements for Future Equity')), in an amount which is no less than Twenty Million Dollars ($20,000,000) (the "*Series B Financing*")

*See* Exhibit A at p. 1.

53.     Thus, because the "digital security" sale was being communicated as a "qualifying financing" which would make the promissory notes "mature," Burstein reasonably believed these digital securities constituted equity securities in AutoLotto.

**BURSTEIN'S INVESTMENT YIELDS ZERO RESULTS AND AUTOLOTTO FLOURISHES WITH A SOON TO BE COMPLETED ACQUISITION BY TRIDENT FOR HUNDREDS OF MILLIONS**

54.     After receiving the "digital securities," Plaintiff was hopeful that she would start to receive some fruits from her investment.

55.     Further raising her expectations were updates in which AutoLotto described promising business ventures they were on the precipice of entering into with global brands such as UNICEF (Exhibit D) and Countable (Exhibit E).

56.     However, despite all of the promising updates coming from AutoLotto, those fruits never ripened.

57.     Perplexed at how terribly her investment was performing, Plaintiff inquired with AutoLotto in May 2019 about her investment and when she would start to see her return.

58.     In return, AutoLotto sent Profit and Loss Statements showing a Net Income loss. *See* Exhibit F.

59.     Additionally, the company explained and sent to Burstein its projected profitable growth model.

60.     As time passed, however, her investment in AutoLotto still did not yield any results.

61.     Then in May 2020, almost two years into her investment, Plaintiff received a notification stating that she was finally entitled to a share of revenue distribution.

62.     But, the amount was $802.15, or 0.000267% of her investment. *See* Exhibit G.

63.     Critically, the only revenue distribution Burstein has received to date is that $802.15.

64.     Burstein started to perform some research on AutoLotto to see if she could uncover any information about AutoLotto to help explain what in the world was going on with the Company.

65.     The information she found out was shocking.

66.     While Burstein (likely many others) saw her investment go nowhere, it turned out AutoLotto was doing well. In fact, AutoLotto was doing very well.

67.     A Google search showed that AutoLotto was on the verge of being acquired by Trident Acquisitions Corp.

68.     The same article stated that AutoLotto's revenue had grown rapidly from 2016 to 2019.

69.     Unfortunately, Burstein's investment had not even moved.

70.     A more recent filing shows that AutoLotto is being acquired for $526 million.

### BURSTEIN REVEALS AUTOLOTTO'S FRAUDULENT OMISSIONS & EVIDENCE OF THEIR FRAUDULENT SCHEME

71.     With the shocking revelation about how abysmally her investment was performing, especially taken alongside the fact that AutoLotto was thriving and was on the verge of being acquired, Burstein decided to retain Counsel to review the Subscription Agreement in an effort to make sense of the situation.

72.     Upon an inspection of the Subscription Agreement and Offering Memorandum, Burstein was notified that AutoLotto had framed the Agreement in a manner that allowed AutoLotto to try to take the position that her investment in AutoLotto was terminated and replaced with an investment in a subsidiary of AutoLotto, LDC. LDC is apparently a wholly owned subsidiary of AutoLotto.

73.     AutoLotto's counsel would later advise Burstein that her investment into the "digital securities" were purportedly disconnected from AutoLotto. This fact, among others, was duplicitously misrepresented, mischaracterized, omitted, and obfuscated.

74.     Rather, according to AutoLotto's counsel, the "digital securities" only entitled to her to a pro rata share of 7% of the "Net Raffle Revenue"[2] generated through something called the "LDC Platform."

75.     Purportedly, the LDC Platform facilitated raffles through smart phones and other mobile devices.

---

[2] The calculation of Net Raffle Revenue is on pg. 23.

76.     Critically, according to AutoLotto, the "LDC Platform" was a completely separate online lottery platform than AutoLotto's online lottery platform. This fact, among others, was duplicitously misrepresented, mischaracterized, omitted, and obfuscated.

77.     The result, according to AutoLotto was that they could use investor money to create the means to raise millions (or even billions) of dollars in raffle tickets through other platforms and keep the revenue from those platforms for itself because that revenue was not generated through the "LDC Platform."

78.     Burstein would never have converted her investment from AutoLotto into just some subsidiary's so-called "digital securities" if she had known this.

## BURSTEIN IS FORCED TO INITIATE THIS LAWSUIT

79.     The more Burstein looked into the transactions, the more it became clear that AutoLotto sold her a false bill of goods for its sole benefit.

80.     Namely, AutoLotto misled Burstein so it could extinguish the $3-million debt it owed her, or her approaching equity interest, in exchange for worthless "digital securities" in a failed platform it had no true intention of monetizing or making profitable.

81.     What is worse, Burstein has come to learn that the LDC Platform is currently out of use by LDC and AutoLotto has no plans to utilize the LDC Platform in the future.

82.     As such, Burstein's investment of $3 million, interest and/or the value of the future equity interest is lost unless this Court intervenes to prevent this fraud and manifest injustice.

## CAUSES OF ACTION

### COUNT I
### (Violation of Section 12 of The 1933 Act, 15 U.S.C. § 77l, For The Sale of Unregistered and Non-Exempt Securities)

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83.     The Defendants violated section 12(a)(1) of the 1933 Act, 15 U.S.C. § 77l(a)(1), and are liable to Plaintiff because the Defendants offered and sold "digital securities" to Plaintiff when the "digital securities" were neither subject to an effective registration statement pursuant to Section 5 of the 1933 Act, 15 U.S.C. § 77e, nor exempt from registration.

84.     Specifically, on or about July 25, 2020, Burstein purchased 6,020,652 "digital securities" in an apparent exchange for converting the AutoLotto Investment.

85.     The Defendants are liable under 15 U.S.C. § 77l for rescission of the sale of the "digital securities" and return of any consideration paid by her and interest from the date of payment down to the date of repayment, less the amount of any income received, together with attorney's fees and expenses of litigation.

### COUNT II
### (Violation of Section 12 of The 1933 Act, 15 U.S.C. § 77l(a)(2), Because of Misrepresentations in Connection with Issuance of a Security)

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

86.     The Defendants violated section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l(a)(2), and are liable to Burstein because in offering to sell and selling securities (the "digital securities") to Burstein, the Defendants made misleading statements of material fact or omissions in a prospectus or oral communications.

87.     The Defendants concocted a scheme to swindle convertible note holders in AutoLotto out of their investment by having them convert their notes into worthless "digital securities" in a separate entity which it had no intent of monetizing.

88.     In doing so, the Defendants omitted, inter alia,(a) that the "digital securities" gave Burstein an interest solely in LDC and not AutoLotto;(b) the "digital securities" only granted Burstein a right to receive "Net Raffle Revenue" in the "LDC Platform;";(c) the LDC Platform and related raffle system is independent of any raffle or lottery system used by AutoLotto; (d)AutoLotto is not required to use the LDC Platform;€ AutoLotto never had any cognizable plans to monetize or make profitable the LDC Platform; and (f) AutoLotto would cease operations of the LDC Platform.

89.     Burstein did not know, and in the exercise of reasonable care could not have known, the truth concerning the Defendants' misrepresentations or omissions.

90.     The Defendants are liable to Plaintiff under 15 U.S.C. § 77l for rescission of her purchases of the "digital securities" and return of any consideration paid by AutoLotto and interest from the date of payment down to the date of repayment, less the amount of any income received, together with attorneys' fees and expenses of litigation.

### COUNT III
### Violation of §10b-5 of the 1934 Act and Rule 10b-5 (Securities Fraud)

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

91.     The Defendants deceived Plaintiff by making untrue statements of material facts and/or omitting to state material facts to make the statements not misleading which operated as fraud and deceit upon the Plaintiff in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

92.     The Defendants concocted a scheme to swindle convertible note holders in AutoLotto out of their investment by having them convert their notes into worthless "digital securities" in a separate entity which it had no intent of monetizing.

93.     As set forth above, the Defendants, with intent to deceive, failed to advise Burstein, inter alia, (a) that the "digital securities" gave Burstein an interest solely in LDC and not AutoLotto;(b) the "digital securities" only granted Burstein a right to receive Net Raffle Revenue in the LDC Platform;(c) the LDC Platform and related raffle system is independent of any raffle or lottery system used by AutoLotto; (d) AutoLotto is not required to use the LDC Platform; (e) AutoLotto never had any cognizable plans to monetize or make profitable the LDC Platform; and (f) AutoLotto would cease operations of the LDC Platform.

94.     The Defendants acted with intent to deceive.

95.     As a result of the Defendants material misrepresentations and omissions, and in reasonable reliance on the false and misleading statements by AutoLotto, Plaintiff purchased the "digital securities."

96.     As a proximate and causal result of the Defendants' conduct, Plaintiff has sustained actual pecuniary loss, including but not limited to, out-of-pocket monies, consequential damages, incidental damages, lost earnings, lost profits, along with other expectation and reliance damages.

## COUNT IV
## Common Law Fraud

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

97.     The Defendants deceived Plaintiff by making untrue statements of material facts and/or omitting to state material facts to make the statements not misleading, which operated as fraud and deceit upon the Plaintiff.

14

98.     The Defendants concocted a scheme to swindle convertible note holders in AutoLotto out of their investment by having them convert their notes into worthless "digital securities" in a separate subsidiary entity which it had no intention of monetizing.

99.     As set forth above, the Defendants, with intent to deceive, failed to advise Burstein, inter alia, (a)  that the "digital securities" gave Burstein an interest solely in LDC and not AutoLotto; (b) the "digital securities" only granted Burstein a right to receive Net Raffle Revenue in the LDC Platform;(c) the LDC Platform and related raffle system is independent of any raffle or lottery system used by AutoLotto;(d) AutoLotto is not required to use the LDC Platform; (e) AutoLotto never had any cognizable plans to monetize or make profitable the LDC Platform; and (f) AutoLotto would cease operations of the LDC Platform.

100.    The Defendants acted with intent to deceive.

101.    As a result of the Defendants' material misrepresentations and omissions, and in reasonable reliance on the false and misleading statements by the Defendants, Plaintiff purchased the "digital securities."

102.    As a proximate and causal result of the Defendants conduct, Plaintiff has sustained actual pecuniary loss, including but not limited to, out-of-pocket monies, consequential damages, incidental damages, lost earnings, lost profits, along with other expectation and reliance damages.

## COUNT IV
### Negligence

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    AutoLotto owed a duty of care to Plaintiff as purchasers of the "digital securities."

15

104.    AutoLotto concocted a scheme to swindle convertible note holders in AutoLotto out of their investment by having them convert their notes into worthless "digital securities" in a separate entity which it had no intent of monetizing.

105.    AutoLotto violated the duties it owed to Plaintiff based upon the acts and omissions set forth in the preceding paragraphs of this complaint, including but not limited to, omitting to advise Burstein, inter alia, (a) that the "digital securities" gave Burstein an interest solely in LDC and not AutoLotto;(b) the "digital securities" only granted Burstein a right to receive Net Raffle Revenue in the LDC Platform;(c) the LDC Platform and related raffle system is independent of any raffle or lottery system used by AutoLotto;(d) AutoLotto is not required to use the LDC Platform;(e) AutoLotto never had any cognizable plans to monetize or make profitable the LDC Platform; and (f) AutoLotto would cease operations of the LDC Platform.

106.    As a proximate and causal result of AutoLotto's conduct, Plaintiff has sustained actual pecuniary loss, including but not limited to, out-of-pocket monies, consequential damages, incidental damages, lost earnings, lost profits, along with other expectation and reliance damages.

## COUNT V
## Breach of Fiduciary Duty

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    AutoLotto owed a fiduciary duty to Plaintiff as purchasers of the "digital securities."

108.    AutoLotto concocted a scheme to swindle convertible note holders in AutoLotto out of their investment by having them convert their notes into worthless "digital securities" in a separate entity which it had no intent in monetizing.

16

109.    AutoLotto violated its fiduciary duties to Plaintiff based upon the acts and omissions set forth in the preceding paragraphs of this complaint, including but not limited to, omitting to advise Burstein, inter alia, (a) that the "digital securities" gave Burstein an interest solely in LDC and not AutoLotto; (b) the "digital securities" only granted Burstein a right to receive Net Raffle Revenue in the LDC Platform;(c) the LDC Platform and related raffle system is independent of any raffle or lottery system used by AutoLotto;(d) AutoLotto is not required to use the LDC Platform;(e) AutoLotto never had any cognizable plans to monetize or make profitable the LDC Platform; and (f) AutoLotto would cease operations of the LDC Platform.

110.    As a proximate and causal result of AutoLotto's conduct, Plaintiff has sustained actual pecuniary loss, including but not limited to, out-of-pocket monies, consequential damages, incidental damages, lost earnings, lost profits, along with other expectation and reliance damages.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff hereby demands a trial by jury of all issues in its Complaint so triable.

DATED this 8th day of September, 2021.

> **CALLAGY LAW, P.C.**
> 1900 NW Corporate Blvd.
> Suite 310W
> Boca Raton, Florida 33431
>
> Jeffrey L. Greyber, Esq.
> Texas Bar No. 24103030
> jgreyber@callagylaw.com
> hcasebolt@callagylaw.com
> *Attorneys for Plaintiff*

17