# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **VARDA BURSTEIN AND SIMILARLY SITUATED DIGITAL SECURITY HOLDERS,** | § § § | |
| *Plaintiff* | § § | **Case No. A-21-CV-793-LY** |
| **v.** | § § | |
| **AUTOLOTTO, INC. AND TONY DIMATTEO,** | § § § | |
| *Defendant* | § § | |

## ORDER AND REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE LEE YEAKEL**
**UNITED STATES DISTRICT JUDGE**

Before the Court are Defendants' Motion to Dismiss Plaintiff's Complaint, filed November 19, 2021 (Dkt. 12); Plaintiff's Opposition to Defendants' Motion to Dismiss, filed December 23, 2021 (Dkt. 16); and Defendants' Reply in Support of Motion to Dismiss Plaintiff's Complaint, filed January 13, 2022 (Dkt. 17). On January 13, 2022, the District Court referred the motion to the undersigned Magistrate Judge for Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Dkt. 18.

## I.    Background and Procedural History

Plaintiff Varda Burstein is "a self-employed businesswoman" who lives in Tel Aviv, Israel. Compl. (Dkt. 1) ¶ 23. Defendant AutoLotto, Inc. is an online gambling company consumers use to play state-sanctioned lottery games in the United States and internationally. *Id.* ¶¶ 18, 22. Defendant Tony DiMatteo is the Chief Executive Officer of AutoLotto and, according to Plaintiff, resides in Texas. *Id.* ¶¶ 19, 24.

Plaintiff decided to invest in AutoLotto after she attended a financial seminar that included a presentation about the company. On February 24, 2018, Plaintiff and AutoLotto executed a Promissory Note in which Plaintiff agreed to invest $3 million in the form of a convertible note (the "Note"). Dkt. 1-1. In exchange for her investment, AutoLotto agreed to repay Plaintiff the $3 million plus interest on the occurrence of a qualified financing. *Id.* at p. 2. If a qualified financing did not occur within two years of the execution of the Agreement, Plaintiff's investment would convert into equity securities in the company. *Id.*

Shortly after she made her investment, Plaintiff alleges, AutoLotto became concerned that she and other investors soon would become shareholders because there was no qualified financing on the horizon. *Id.* ¶ 35. Plaintiff alleges that AutoLotto and DiMatteo then developed the following "scheme" to prevent investors from becoming shareholders:

> AutoLotto, through the commands of its CEO, would dupe investors into converting their notes into new and exciting "digital securities" that would entitle the "digital security" holder to a portion of revenue in the platform that AutoLotto would claim had amazing potential and promise. Then after the investors converted their note, AutoLotto put essentially no effort into making the platform profitable and later claimed that this was a risk of investing in risky "digital securities."

*Id.* ¶¶ 37, 38. Plaintiff alleges that AutoLotto contacted her in June 2018 "to explore the 'amazing opportunity' to convert her note into 'digital securities.'" *Id.* ¶ 39. Plaintiff alleges that AutoLotto told her it was seeking close to $500 million in investments and that "substantially all of the promissory notes are expected to convert." *Id.* ¶ 42. Plaintiff further alleges that she was led to believe that the money she previously invested was already used, at least in part, to fund this new platform. Plaintiff contends that "AutoLotto intentionally used manipulative tactics to influence Burstein into believing this opportunity with AutoLotto was too good to pass up," and thus agreed to convert her note into digital securities. *Id.* ¶ 44.

On July 25, 2018, Plaintiff executed a Subscription Agreement with AutoLotto's wholly owned subsidiary, LDC Crypto Universal Public Limited Co. ("LDC"), in which she agreed to convert her Note with AutoLotto into digital securities invested in LDC. Dkt. 1-3. Specifically, the Subscription Agreement provides:

> [Plaintiff] hereby elects to convert the entire principal of the Convertible Note, together with all accrued but unpaid interest (the "Subscription Proceeds"), into Digital Securities. Upon issuance of Digital Securities, the Convertible Note shall be deemed paid in full and shall be deemed automatically cancelled without any further action by [Plaintiff], and neither Lottery.com nor [LDC] shall have any outstanding obligations or liability of any kind related to the Convertible Note.

*Id.* § 2.A. The Digital Securities would entitle Plaintiff to a pro rata share of 7% of the "Net Raffle Revenues" generated through the "LDC Platform," which facilitated raffles through smart phones and other mobile devices. Dkt. 1 ¶¶ 74, 75. The Subscription Agreement also contains an arbitration clause requiring the parties to arbitrate "[a]ny dispute, controversy or claim arising out of or relating to the application, interpretation, or enforcement of this Agreement." Dkt. 1-3 § 20 ("Arbitration Clause/Agreement").

Although Plaintiff signed the Subscription Agreement and attested that she "has read this Subscription Agreement in its entirety and agrees to be bound hereby," *id.* at 13, Plaintiff alleges that she believed that the digital securities constituted equity securities in AutoLotto, not LDC. While AutoLotto eventually become profitable, LDC did not. Plaintiff complains that the only return on investment she has received was a $802.15 royalty check from LDC in May 2020. On March 11, 2021, Plaintiff sent a demand letter to AutoLotto, asserting that AutoLotto and LDC fraudulently induced her to enter into the Subscription Agreement. Dkt. 12 at 5.

On May 11, 2021, after receiving Plaintiff's demand letter, LDC invoked the Arbitration Clause and filed a Demand for Arbitration with the American Arbitration Association ("AAA").

LDC sought a declaration that Plaintiff is bound by the Subscription Agreement, that the Agreement was not induced by fraud, and that it remains a valid and enforceable contract between LDC and Plaintiff. Dkts. 12 at 5, 12-2 (the "Arbitration"). After LDC filed the Arbitration, Plaintiff filed this suit on September 8, 2021 against AutoLotto and DiMatteo ("Defendants"). She did not name LDC as a defendant.

On September 27, 2021, Plaintiff filed a "Jurisdictional Brief" in the Arbitration challenging the jurisdiction of the AAA and Panel of Arbitrators to resolve the dispute. Specifically, Plaintiff argued that (1) the District Court should determine whether the claims asserted in the Arbitration are arbitrable; (2) LDC cannot use the Subscription Agreement to require arbitration of Plaintiff's fraud claims; (3) the Arbitration Tribunal should not make legal determinations regarding arbitrability; and (4) Plaintiff should be able to proceed with her claims in the forum of her choice. Dkt. 12-4.

The Arbitration Tribunal issued an order denying all of Plaintiff's jurisdictional challenges on November 4, 2021. Dkt. 12-5. First, the Tribunal held that LDC's claim that the Subscription Agreement was induced by fraud and remains a valid and enforceable contract fell within the scope of the Arbitration Clause. *Id.* at 4. Next, the Tribunal concluded that it could determine the question of arbitrability because Plaintiff was challenging the validity of the entire Subscription Agreement, not just the validity of the Arbitration Clause. *Id.* Finally, the Tribunal relied on precedent of the Fifth and Ninth Circuit Courts of Appeal to find that incorporation of the AAA arbitration rules in the Arbitration Agreement provided "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability. *Id.* at 5. The Arbitration is proceeding in California, and the Tribunal has set the case for a hearing in November 2022. Dkt. 12 at 6.

In her Complaint, Plaintiff alleges the following claims under the Securities Act of 1933: (1) the sale of unregistered and non-exempt digital securities, in violation of Section 12(a)(1); (2) misrepresentations in connection with the issuance of the digital securities, in violation of Section 12(a)(2); and (3) securities fraud, in violation of Section 10(b). Plaintiff also asserts common law claims for fraud, negligence, and breach of fiduciary duty. Plaintiff seeks recission of her purchase of digital securities, the "return of any consideration paid by her and her interest from the date of payment down to the date of repayment, less the amount of any income received," consequential damages, lost earnings, lost profits, expectation and reliance damages, and attorneys' fees and costs. Dkt. 1 ¶ 85.

Defendants now move to compel arbitration and dismiss Plaintiff's lawsuit based on the Arbitration Clause in the Subscription Agreement. Defendants argue that Plaintiff filed this suit in an attempt to avoid the Arbitration Clause, and that she must be compelled to arbitration. Plaintiff opposes the motion, arguing that the Arbitration Clause is unenforceable.

## II.    Legal Standards

Under the Federal Arbitration Act ("FAA"), parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). The FAA also allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes. *Id.*

The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000). "By its terms, the Act leaves no

place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "Accordingly, there is a strong presumption in favor of arbitration and a party seeking to invalidate an arbitration agreement bears the burden of establishing its invalidity." *Carter v. Countrywide Credit Indus.*, 362 F.3d 294, 297 (5th Cir. 2004).

Courts apply a two-step analysis to determine whether parties should be compelled to arbitrate a dispute. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). First, the court applies state law to determine "whether the parties entered into *any arbitration agreement at all*." *Id.* Second, the court interprets the contract "to determine whether *this* claim is covered by the arbitration agreement." *Kubala*, 830 F.3d at 201. The second step ordinarily is for the court. *Id.* But "the analysis changes" where the agreement delegates to the arbitrator "the primary power to rule on the arbitrability of a specific claim." *Id.* In such a case, the court asks only whether there is a valid delegation clause. *Matter of Willis*, 944 F.3d 577, 579 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2828 (2020). "Delegation clauses are enforceable and transfer the court's power to decide arbitrability questions to the arbitrator. Thus, a valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala*, 830 F.3d at 202.

### III.    Analysis

The Subscription Agreement into which Plaintiff and LDH entered contains the following Arbitration Clause:

> Any dispute, controversy or claim arising out of or relating to the application, interpretation, or enforcement of this Agreement which cannot be amicably settled shall be referred to and finally resolved by arbitration in accordance with the rules of arbitration of the American Arbitration Association (the "AAA") . . . .

Dkt. 1-3 § 20. Defendants argue that Plaintiff is bound by this Arbitration Clause and that Plaintiff's lawsuit "is an improper attempt to avoid her prior commitment and binding contractual obligation to resolve disputes via arbitration before the [AAA]." Dkt. 12 at 1. Defendants contend that the Court should enforce the Arbitration Clause, compel Plaintiff to arbitrate her claims in the pending arbitration, and dismiss Plaintiff's lawsuit with prejudice.

Plaintiff responds that the Defendants' motion to compel arbitration should be denied because there is no valid agreement to arbitrate. Alternatively, Plaintiff argues that the Court should allow her to conduct discovery before ruling on the motion to compel arbitration. She also argues that her claims are outside the scope of the Arbitration Clause.

The Court applies the two-step analysis to determine whether parties should be compelled to arbitrate a dispute. *Kubala*, 830 F.3d at 201.

### A. Agreement to Arbitrate

At step one of the analysis, the Court must determine whether the parties formed "*any arbitration agreement at all*." *Id.* Plaintiff does not dispute that she signed and executed the Subscription Agreement with LDH on July 25, 2018. Dkt. 1 ¶¶ 47, 72. Nevertheless, she avers that "Defendants cannot meet their burden to prove that a valid arbitration agreement exists because the contract (the Subscription Agreement) in which that purported agreement lies is not valid." Dkt. 16 at 11. Plaintiff contends that the Subscription Agreement is invalid because there was no meeting of the minds in that she did not know that the digital securities would become worthless, and that Defendants made fraudulent representation to her.

Challenges to the validity of arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract" can be divided into two types. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). The first type specifically challenges the validity of

the agreement to arbitrate. *Id.* "The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.*

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), the Supreme Court addressed the question of who—court or arbitrator—decides these two types of challenges. The issue in that case was "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." *Id.* at 402. Guided by Section 4 of the FAA, the Court held that,

> if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403-04. Subsequently, in *Buckeye Check Cashing*, 546 U.S. at 449, the Court reaffirmed that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."

Here, Plaintiff argues that the Subscription Agreement as a whole is invalid based on Defendants' fraudulent representations. Because Plaintiff challenges the Subscription Agreement as a whole, not the Arbitration Clause specifically, her challenge must be considered by the Arbitration Tribunal, not the Court. *See Buckeye Check Cashing*, 546 U.S. at 446 ("[W]e conclude that because respondents challenge the Agreement, but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract. The challenge should therefore be considered by an arbitrator, not a court."); *Maravilla v. Gruma Corp.*, 783 F. App'x 392, 396 (5th Cir. 2019) ("Despite his attempts to narrowly frame his arguments to challenge only the arbitration agreement, [plaintiff's] contention of not being able to read the contract pertains to

the validity of the contract as a whole. Therefore, it is a decision for the arbitrator."); *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 397 (5th Cir. 2006) (holding that investors' claims of error, fraud, or unconscionability in connection with their underlying contracts as a whole, and not just the arbitration clauses included in such agreements, were for arbitrator, not court, to decide); *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 472 (5th Cir. 2002) (holding that plaintiff's capacity defense argument must be submitted to arbitrator because it was directed at entire agreement and not specific challenge to arbitration clause); *Snap-on Tools Corp. v. Mason*, 18 F.3d 1261, 1267 (5th Cir. 1994) (submitting fraudulent inducement defense to arbitration because allegations of fraud did not relate to arbitration clause specifically).

## B. Arbitrability

The next step in the Court's analysis ordinarily would be to determine whether Plaintiff's claims are arbitrable, that is, whether they fall within the Arbitration Clause. *See Kubala*, 830 F.3d at 201. "But where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." *Id.* "In such a case, [courts] ask only whether there is a valid delegation clause. If there is, then the *arbitrator* decides whether the claim is arbitrable." *Matter of Willis*, 944 F.3d at 579-80.

Defendants argue that the parties delegated the power to rule on the arbitrability issue to the Arbitration Tribunal because they expressly incorporated the AAA Rules into their Arbitration Agreement. The Arbitration Clause provides that all disputes "shall be referred to and finally resolved by arbitration in accordance with the rules of arbitration of the American Arbitration Association." Dkt. 1-3 § 20. AAA Rule 7 provides that:

> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

> (b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

AAA-ARBRLCML R-7 (October 2013).

The Supreme Court "has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein*, 139 S. Ct. at 530 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). A contract "need not contain an express delegation clause to meet this standard; rather, "an arbitration agreement that incorporates the AAA Rules 'presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.'" *Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 279 (5th Cir. 2019) (quoting *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012)).

In this case, because the Arbitration Clause expressly incorporates the AAA Rules, there is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. Therefore, whether the Plaintiffs' claims are subject to arbitration must be decided in the first instance by the arbitrator, not the Court. *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 263 (5th Cir. 2014) (holding that whether plaintiffs' claims were subject to arbitration had to be decided in first instance by arbitrator where contract incorporated AAA rules). The Court cannot rule on the majority of the arguments Plaintiff raises in her Response to the Motion to Dismiss because the Arbitration Tribunal must rule on those issues in the first instance.

### C.  Discovery

Plaintiff asks the Court to allow her to conduct discovery before ruling on the motion to compel arbitration so she can respond to Defendants' allegations adequately. Because the Court finds that the Arbitration Tribunal has jurisdiction to determine arbitrability in this case, it would be inappropriate to order discovery. Plaintiff's Request to Conduct Discovery is **DENIED**.

### D.  Conclusion

Plaintiff has failed to sustain her burden to demonstrate that the Arbitration Agreement is invalid. *Carter*, 362 F.3d at 297. The Court finds that the parties are bound by the Arbitration Agreement. Accordingly, Defendants' Motion to Compel Arbitration should be granted.

Once the court determines that a motion to compel arbitration should be granted, the FAA instructs the court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. The Fifth Circuit, however, has held that dismissal, as opposed to a stay pending arbitration, is proper "when *all* of the issues raised in the district court must be submitted to arbitration." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *see also Griggs v. S.G.E. Mgmt., L.L.C.*, 905 F.3d 835, 839 (5th Cir. 2018) ("Some circuits have held that district courts must stay a case when all claims are submitted to arbitration, but this circuit allows district courts to dismiss such claims outright."); *Adam Techs. Int'l S.A. de C.V. v. Sutherland Global Servs., Inc.*, 729 F.3d 443, 447 n.1 (5th Cir. 2013) ("Although Section 3 of the Federal Arbitration Act directs district courts to stay pending arbitration, we are bound by our precedent which states that dismissal is appropriate 'when *all* of the issues raised in the district court must be submitted to arbitration.'") (quoting *Alford*, 975 F.2d at 1164)).

Because all issues Plaintiff has raised must be referred to arbitration, the Court recommends dismissal of this action.

## IV.    Order and Recommendation

Based on the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Compel Arbitration and Dismiss (Dkt. 12) and **DISMISS** Plaintiff's Complaint without prejudice. The Court **DENIES** Plaintiff's Request to Conduct Discovery.

The Court **FURTHER ORDERS** that the Clerk remove this case from the Magistrate Court's docket and **RETURN** it to the docket of the Honorable Lee Yeakel.

## V.    Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on April 26, 2022.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE